15 F.3d 1160
 304 U.S.App.D.C. 429
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America, Plaintiff-appellee,
v.
Pernell LAWSON, Defendant-Appellant.
 No. 92-3214.
 United States Court of Appeals, District of Columbia Circuit.
 Jan. 3, 1994.
 
 Before: WALD, BUCKLEY, WILLIAMS, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This cause came to be heard on appeal of the defendant from the judgment of the district court, and it was briefed and argued by counsel. The issues have been accorded full consideration by the Court and occasion no need for a published opinion. See D.C.Cir.Rule 14(c) (1993).
 
 
 2
 Appellant challenges the district court's denial of a motion to suppress illegal drugs seized from appellant after he had been stopped by officers of the Metropolitan Police Department and consented to a search. Appellant argues that the officers did not have the articulable suspicion necessary in order to justify the stop under Terry v. Ohio, 392 U.S. 1 (1968), and that the consent to be searched was involuntarily given.
 
 
 3
 For the reasons stated in the accompanying Memorandum, it is
 
 
 4
 ORDERED AND ADJUDGED, by the Court, that in No. 92-3214, the record is remanded to the district court for a further hearing and specific findings on whether Officers Nassar and Croson had reason to believe that Pernell Lawson had offered to sell them illegal narcotics prior to the encounter involved in this case and for reconsideration of the motion to suppress in light of these findings and the attached memorandum.
 
 
 5
 Consistent with Local Rule 15(c) (1993) this Court retains jurisdiction over No. 92-3214 while said proceedings occur. Upon completion of said proceedings, the Clerk of the United States District Court for the District of Columbia shall promptly transmit the record of this case back to this Court.
 
 
 6
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely-filed petition for rehearing. See D.C.Cir.Rule 15 (1993).
 
 MEMORANDUM
 
 7
 Appellant Pernell Lawson challenges the district court's denial of a motion to suppress evidence seized in the course of a search performed following a stop. United States v. Lawson, No. 92-0134 (May 26, 1992) (memorandum order) ("Mem. Ord."). Lawson charged that the police officers lacked the reasonable suspicion necessary to conduct a valid investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968) and Alabama v. White, 496 U.S. 325 (1990) and that his alleged consent to be searched was coerced by the officers. The district court in a memorandum order upheld the stop solely on the basis that Lawson was in a high crime area and was pointed out by an anonymous individual as "ha[ving] a lot of dope." It also found that appellant had voluntarily consented to the subsequent search. Because we disagree that the two factors relied upon by the district court were sufficient to uphold the validity of the stop, and are unable to determine from the record whether there existed other facts justifying the stop, we remand the record to the district court to hold further hearings and make additional findings.
 
 I. BACKGROUND
 
 8
 On February 21, 1992, around 7:40 p.m. Officer Nassar and four other officers of the Metropolitan Police Department were "clearing the block" at 1400 First Street, a high drug area, by telling groups of people to move on.[1] Officer Nassar "witnessed" Pernell Lawson being pushed southbound on First Street in his wheel chair by Eric Jones, a.k.a. "Erky Berk." There is some testimony that the officers believed Erky Berk to have been a drug dealer. Around ten minutes later Officer Nassar was approached by an unidentified woman who informed him that "The guy in the wheelchair with Erky Berk has a lot of dope." [Hearing Transcript ("T.") at 27.] In its memorandum order, the district court notes the woman as saying "that the defendant had purchased large amounts of drugs." Mem. Ord. at p. 3. The district court also speculates about a connection between the woman and the purchase. Id. at p. 3 n. 3. However, the transcript reflects that the tip contained no more specific information than that the man in the wheel chair being pushed by Erky Berk "has a lot of dope." [T.23.] The informant gave no indication of any knowledge of Lawson's involvement in any past or future drug transaction.
 
 
 9
 Officer Nassar did not attempt to elicit any additional information from the tipster, but carried on with clearing the block. Pressed for his reasons for dismissing the tip at that point, he likened it to one of the frequent, meritless complaints through which "people try[ ] to get each other in trouble." [T.25.] After the other officers finished clearing the block Officer Nassar called them together and told them about the tip.
 
 
 10
 As Officer Nassar was informing his fellow officers about the tip, Lawson and Erky Berk were seen moving towards them up First Street and then turning left up P street. The officers caught up with the pair and stopped them. (The government concedes that appellant was "stopped.") There is some indication in the record that appellant may have been surrounded by the five uniformed police officers when the pair was stopped. At that point Erky Berk assumed the position to be searched by spreading his hands across the police cars and said "Go ahead, do it, get it over with, I know you're going to do it." [T.39.] The officers searched Erky Berk and found nothing. At about the same time, Officer Croson asked Lawson for permission to search him, and Lawson agreed to the officer's request. Officer Fulton reached into Lawson's inside pocket and recovered packets of crack cocaine. Lawson was then placed under arrest.
 
 
 11
 The district court denied Lawson's pretrial motion to suppress the seized drugs. Lawson charged that the stop was illegal and his subsequent consent involuntarily given. The district court held that the stop was justified because
 
 
 12
 [t]he Court is satisfied that Officer Nassar was approached by an unidentified female who stated that the defendant had purchased a large amount of drugs. Upon receipt of this information, and knowing that he was in a high drug area, the officer had the right and duty to investigate the report. When the officers approached the defendant and [Erky Berk] (Jones), they met the description given by the unidentified female so there were grounds to make a brief investigatory stop.
 
 
 13
 Mem. Ord. at p. 3 (citing Terry v. Ohio, 392 U.S. 1 (1968) and Alabama v. White, 496 U.S. 325 (1990)). Based on the unrebutted testimony of the officers, the district court further held that Lawson consented to the search. While it "seem[ed] clear" that "some of the actions of the officers [of routinely stopping and frisking people in that neighborhood] go beyond what is legally permissible," the court held that, focussing on the particular individual involved, i.e., Pernell Lawson, consent to be searched was voluntarily given.
 
 
 14
 Upon the denial of Lawson's motion to suppress, the defendant accepted the government's offer of a conditional plea of guilty which reserved the right to appeal the adverse ruling on the suppression motion. See Fed.R.Crim.P. 11(a)(2). Appellant now challenges the district court's ruling on the validity of the stop and the voluntariness of appellant's subsequent consent to be searched. In reviewing the denial of a motion to suppress we review the district court's findings of fact under a clearly erroneous standard and its legal conclusions de novo. United States v. Garrett, 959 F.2d 1005, 1007 (D.C.Cir.1992).
 
 II. ANALYSIS
 A. Validity of the Stop
 
 15
 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated...." U.S. CONST.AMEND. IV. In Terry v. Ohio, 392 U.S. 1, 21 (1968), the Supreme Court first recognized the legitimacy of a brief investigatory stop where officers have "specific and articulable facts" reasonably supporting the inference that the individual may be engaged or about to become engaged in illegal activity. The government in this case has conceded that it stopped appellant for a brief investigation. In determining whether the officers had the articulable suspicion necessary to justify the stop, we must look to the " 'totality of the circumstances--the whole picture.' " United States v. Sokolow, 490 U.S. 1, 8 (1989) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).
 
 
 16
 Courts have relied on several factors in assessing whether a stop was justified--two of which were determined by the district court to be sufficient in this case.
 
 1. The High Crime Area
 
 17
 The area in which a suspect is observed may serve as the background against which additional information is interpreted. See United States v. Garrett, 959 F.2d 1005, 1007 (D.C.Cir.1992) (neighborhood was factor in interpreting observed transaction made from anonymously identified vehicle as drug transaction), United States v. Rickus, 737 F.2d 360 (3d Cir.1984) (inordinately slow and apparently aimless driving of car at 3:30 a.m. through residential area recently victimized by a rash of burglaries); United States v. White, 655 F.2d 1302, 1303-04 (D.C.Cir.1981) (transaction in high drug area interpreted to be drug related). However, in the absence of additional information, mere presence in a high crime area is not sufficient to justify a stop. See, e.g., Brown v. Texas, 443 U.S. 47, 51-52 (1979) (two men meeting in alley in neighborhood frequented by drug users insufficient to justify stop), 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE Sec. 9.3(c) (2D ED.1987) (presence in high crime neighborhood--while not sufficient in itself--is one factor that may be weighed in justifying stop).
 
 2. The Anonymous Informant
 
 18
 Courts also recognize that the police ought not to ignore information solely because it is received from anonymous individuals. The variety of circumstances surrounding tips has dissuaded courts from enunciating any clear test for determining the significance that may be placed on those received from anonymous informants. As a general matter, however, a court will examine whether the tip was imbued with sufficient "indicia of reliability" to warrant the officer's subsequent action. Alabama v. White, 496 U.S. at 328 (quoting Adams v. Williams, 407 U.S. 143, 147 (1972)). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors--quantity and quality--are considered in the totality of the circumstances...." Id. at 330 (internal quotes and citation omitted). We briefly note the relevant considerations in examining the anonymous informant's tip in this case.
 
 
 19
 If an unknown informant predicts future behavior, or conveys particularly detailed information, and the tip is largely verified by subsequent police surveillance an investigatory stop will be justified. See id. at 332; United States v. White, 648 F.2d 29, 44 (D.C.Cir.), cert. denied, 454 U.S. 924 (1981) ("the informant must have (1) seen [the named suspect] leave with the driver and (2) known enough about the pattern of his actions to predict the time of his return and what he would be doing in the interim"); United States v. Andrews, 600 F.2d 563 (6th Cir.), cert. denied, 444 U.S. 878 (1979) (tip that a certain named and described individual would deplane at approximately 4 p.m. at Detroit's Metropolitan Airport coming from Los Angeles in the company of either a black man or black woman, carrying a quantity of heroin to be delivered to a named, known local heroin trafficker justified stop).
 
 
 20
 An anonymous tip is considered more reliable, if the information is conveyed in a face-to-face interaction with the police officer, because "presumably [the informant is] aware of the possibility of being arrested for making a false report." Brown v. United States, 590 A.2d 1008, 1015-16 (D.C.1991). See United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir.1991), cert. denied, 112 S.Ct. 1975 (1992) (face-to-face information that a described individual would enter and leave specifically identified apartment, not his own, in order to sell crack on street justified protective patdown in the course of which drugs were found on defendant).
 
 
 21
 Furthermore, if an informant declares that a described individual is armed, courts have upheld protective investigatory stops despite the tip's lack of detail or prediction of behavior. See Adams v. Williams, 407 U.S. 143 (1972) (informant known to officer notified same of defendant's gun in waistband, thereby justifying protective search). The same is true even where the tip is anonymous. See United States v. Clipper, 973 F.2d 944 (D.C.Cir.1992) (anonymous telephone tip that a described individual near named location was armed justified protective search), cert. denied, 113 S.Ct. 1025 (1993).
 
 
 22
 Lastly, in some situations, an officer's failure to inquire about further details prior to acting on a tip may be excused. For example, in United States v. Sierra-Hernandez, 581 F.2d 760 (9th Cir.), cert. denied, 439 U.S. 936 (1978), an unidentified man drove up to an officer who was checking the citizenship papers of field workers and pointed to a truck proceeding on a road about one hundred yards away, declaring "The black pickup truck just loaded up with weed at the canebreak." 581 F.2d at 762. The officer did not ask the informant any questions, but knowing that the "canebreak" was a site of prior drug smuggling, radioed for assistance and proceeded to stop the truck. Finding the stop justified, the court noted the circumstances favoring reliance on the tip: (i) the officer's knowledge concerning the canebreak; (ii) the specificity as to the time and kind of criminal activity involved; (iii) the availability of the informant for further questioning at time of giving the tip; (iv) the fact that the informant was driving a car from which his identity could be easily traced. Furthermore, the court held,
 
 
 23
 there are reasons to support the agent's failure to converse further with the informant, to ask for his name, or to note the license of his car. The suspect was in a vehicle moving away from the agent when the tip came, and we can infer from the record that it was reasonable for the agent to use his time to radio for assistance and to set off in pursuit, rather than to question the informant. There is nothing in the record which should have caused the agent to doubt the reliability or good faith of the informant in tendering information.
 
 
 24
 Id. at 763.
 
 3. The District Court's Conclusion
 
 25
 The district court concluded from the facts of this case that Pernell Lawson's presence in a high crime area together with the anonymous tip justified the brief investigatory stop. We disagree. The sole factor arguing in favor of reliance on the tip here was that it was conveyed face-to-face. The information gained was otherwise totally nonspecific as to the source or kind of drugs in Lawson's possession, or predictions of Lawson's future activities--nothing conveyed by the informant implied her intimate acquaintance with the suspect's activities. The tipster did not assert that the suspect was armed; nor did the situation otherwise require particularly swift action excusing the officer from following up on more details with the informant. Aside from the bareboned allegation concerning presence of drugs, the tip did not furnish Officer Nassar with any information that the officer could not have casually observed himself as Lawson was being pushed past him by Erky Berk moments before the tip.
 
 4. Lawson's Association with Erky Berk
 
 26
 The district court's oral ruling also mentions that the officers believed Erky Berk to be a drug dealer. Perhaps because the testimony about Erky Berk's prior drug dealings was vague, the court's written memorandum conspicuously omits this fact altogether. On appeal, however, the government urges us to rely on the association between Lawson and Erky Berk as a basis for the legality of the stop.
 
 
 27
 While mere association with a person suspected of criminal activity is insufficient to justify a stop, cf. Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"), we do not dispute that the addition of other circumstances including, for example, signs of common criminality among the suspect and his criminal companion, may justify a court's taking a suspect's association with the criminal into account when deciding upon whether a stop was legally justified. For example, in the cases cited by the government in which the association with a known criminal was a factor justifying the stop, the courts relied upon specific actions of the defendant or his companion indicating some joint criminal activity on the part of the observed couple. See United States v. Silva, 957 F.2d 157, 160-61 (5th Cir.) (finding reasonable suspicion to stop defendant who was in company of individual about to be arrested and fled when officers approached him), cert. denied, 113 S.Ct. 250 (1992); United States v. Chaidez, 919 F.2d 1193, 1200 (7th Cir.1990) (finding stop justified because defendant separated and met up with criminal who delivered package when accompanied by defendant and officers thought the two were attempting to flee), cert. denied, 112 S.Ct. 209 (1991); United States v. Jones, 759 F.2d 633, 643 (8th Cir.) (finding stop justified because defendant ran from front of apartment after seeing officers and after a known burglar making furtive effort to hide face exited other side of building), cert. denied, 474 U.S. 837 (1985).
 
 
 28
 Having one's wheelchair pushed by a reputed drug dealer, even in the high drug neighborhood together with the unspecific tip, would, however, present a close case on the existence of sufficient suspicion to stop Lawson. Compare Smith v. United States, 558 A.2d 312 (D.C.App.1989) (en banc) (finding no basis for stopping individual who was observed conversing in parking lot in high drug area with two persons known to have sold drugs two minutes earlier) with United States v. Reid, 997 F.2d 1576, 1579 (D.C.Cir.1993) (upholding stop and frisk of individual who had just exited an apartment which the police were approaching to execute a search warrant for narcotics and officer felt endangered by individual's potential presence behind him and his colleagues) and United States v. McKie, 951 F.2d 399, 400, 402 (D.C.Cir.1991) (tip of "unchallenged reliability" informed police that a described crack dealer was again "working" in a store parking lot selling crack and returning to identified car to place remaining drugs under floormat and then drive away only to return later; reasonable suspicion found to stop individual observed in parking lot speaking to the suspected dealer "at the very time and in the very place of the suspected drug dealing" and then getting into the very car in which suspected dealer "stored his drug supply" whereupon the two drove away) (emphasis omitted); cf. Sibron v. New York, 392 U.S. 40 (1968) (individual's conversations with over nine known narcotics addicts on the street and in a restaurant over an eight hour period did not give police officer reason to search him).
 
 
 29
 Since the district court's factual findings with respect to Lawson's association with Erky Berk were rather vague in the oral ruling and absent from the written memorandum order, we remand the record to the district court for a clarification of the court's finding on this factual question in the event that the trial judge decides to rely on the association as a basis justifying the stop. cf. United States v. Jordan, 951 F.2d 1278 (D.C.Cir.1991) (remanding for clarification of factual finding), appeal after remand, 958 F.2d 1085 (1992); United States v. Williams, 951 F.2d 1287 (D.C.Cir.1991) (remanding record for factual findings and conclusions of law based on those findings). In the event that he does so rely, the district court should review the suppression hearing record as it currently stands and clarify whether the officers reasonably believed Erky Berk to be a drug dealer and on what basis Lawson's association with Erky Berk would provide the necessary additional justification for a stop. We emphasize herein that if the district court does not rely on Lawson's association with Erky Berk as a factor justifying the stop he is under no obligation to make further findings on this issue.
 
 5. Prior Offer to Sell
 
 30
 The government also claims on appeal that when stopping Lawson, the officers recognized him as the person who had, one week prior to the stop, aborted a proposed sale of drugs to the officers upon realizing their true identity. While Officers Nassar and Croson did testify about such a prior offer to sell, neither the trial court, nor the government, relied in any way on this alleged prior undercover transaction as a factor establishing articulable suspicion to stop appellant.
 
 
 31
 After the Court's own questioning elicited Officer Nassar's first testimony about the prior offer to sell, the following colloquy ensued:
 
 
 32
 Ms. Marshall (Defense): Your Honor, for the record, that is the first time I had ever heard of that at all.
 
 
 33
 The Court: Heard of what?
 
 
 34
 Ms. Marshall: What that Officer testified, what the Court elicited, and I take it the government is not going to try to elicit that in any fashion in this case, [be]cause it's not in any of the paperwork or anything. I had never heard of it.
 
 
 35
 Mr. Molock (Prosecution): To respond to that, that is correct, we certainly do not intend to offer that, your Honor, just things dealing with this case.
 
 
 36
 The Court: All right.
 
 
 37
 [T.31-32.] While government counsel might be read only to be declaring his intention not to elicit testimony about the prior undercover investigation at the upcoming trial, the exchange can also be read plausibly as declaring the government's intention not to rely on the undercover operation at the suppression hearing itself to buttress the legality of the stop. The colloquy is truly cloudy. It was the court--never the government--who elicited the testimony concerning this prior undercover operation; the government in its summation at the suppression hearing did not mention the undercover operation; and the court itself subsequently did not mention the undercover incident either in its oral ruling or its written memorandum.
 
 
 38
 While the Court did make a general statement that it credited the officers' testimony in its memorandum opinion, it did so only in the context of the conflicting testimony as to the voluntariness of the consent to search, not in relation to the circumstances of the stop itself. And there was conflicting testimony as to the events leading to the stop. For instance, Officer Nassar testified that at the time he originally received the anonymous tip (after he had already witnessed Lawson and Erky Berk together) he did not know the tipster was referring to Lawson "in particular[,] I knew it was the guy in the wheelchair with Erky Berk, that's about all I knew." [T.28.] This testimony could be viewed as not entirely consistent with Officer Nassar's claim that he recognized appellant just a few minutes later as the person who had previously offered to sell him drugs.
 
 
 39
 Probably because evidence about the prior drug sale was not purposefully elicited by the government in the course of its case nor ever mentioned by the court in its opinion, the record in its present state does not focus on the occurrence of any prior offer to sell with the certainty necessary for us, on appeal, to rely on it as a factor justifying the search. See United States v. Garrett, 720 F.2d 705, 710 (D.C.Cir.1983) ("where the correctness of the district court's decision depends upon a determination of fact which only a [fact-finder] could make but which has not been made, the appellate court cannot take the place of the [fact-finder]" (quoting SEC v. Chenery, 318 U.S. 80, 88 (1943)), cert. denied, 465 U.S. 1037 (1984).
 
 
 40
 If the district court on remand were to find that Officer Nassar or Officer Croson recognized Lawson as the person who they reasonably believed had previously offered to sell them drugs, it could conclude that (in light of the tip and Lawson's presence in a neighborhood known for drug sales) the officers had the requisite articulable suspicion to justify stopping Lawson. Cf. Carroll v. United States, 267 U.S. 132 (1925) (probable cause found to stop and search automobile of defendants who had on prior occasion aborted illegal sale of liquor to undercover officers and were subsequently seen together underway to and from a center for bootlegging). Therefore, we remand the record to the trial court to determine whether the Officers reasonably believed Lawson to have attempted to sell illegal drugs to Officers Nassar and Croson prior to the time of the stop. Because we believe that defense counsel may have been as confused as we are about the government's intention to rely on the prior offer to sell drugs as buttressing the legality of the stop, the district court shall hold additional hearings to determine whether reliance on any prior offer to sell as a basis to stop Lawson was justified, and reconsider the suppression motion in light of his new findings.
 
 B. Voluntariness of the Search
 
 41
 Appellant argues that his consent to be searched after being stopped was given involuntarily. First, appellant argues that the consent was obtained against a backdrop of unlawful searches and seizures routinely conducted by the police in the neighborhood in which Lawson was stopped. Next, appellant maintains that when requesting permission to search him the officers completely surrounded him, were in full uniform, aggressively questioned him as to what he was doing outside, searched his companion, and did not inform Lawson that he could refuse the search. The district court agreed that Lawson's "consent" to be searched was given in the context of highly questionable search and seizure practices by the police in that neighborhood. However, relying on United States v. Lewis, 921 F.2d 1294 (1990), the court focussed on the particular individual who consented to the search, i.e. Pernell Lawson, and concluded that the consent had been given voluntarily. Appellant now charges that the district court relied too closely on the factors enunciated as significant in Lewis, thereby failing to consider the totality of the circumstances in evaluating the likelihood that appellant's "consent" to the search was truly voluntary.
 
 
 42
 In examining whether Lawson had voluntarily consented to the search, the district court focussed on
 
 
 43
 whether there were any restrictions on the movement of the defendant, whether the defendant consented to the search without hesitation, whether the search exceeded the bounds of the defendant's consent and whether the testimony of the officer is challenged, and if so, whether it has been effectively rebutted.
 
 
 44
 Mem.Ord. at p. 6. It took these factors from our Lewis decision which, however, did not purport to lay out a general test for examining whether an individual consented to a search, but instead identified these factors as significant in determining whether the individual in Lewis had consented to the search. Ultimately, of course, Lewis examined the "totality of the circumstances" in deciding whether the consent in that case had been coerced. See Lewis, 921 F.2d at 1300.
 
 
 45
 Nonetheless, in the context of this case we are unable to detect any misconstruction of applicable law in the district court's ruling. We do not find that the court disregarded any significant circumstances under which Lawson expressed his consent. The district court explicitly considered the background of the allegedly coercive police practices in the neighborhood, the restriction of the defendant's movement when being questioned, and the search of Erky Berk in Lawson's presence. Mem.Ord. at pp. 3-7. We also remain unconvinced by appellant's argument that the trial court "erred by considering whether the defendant presented evidence in support of his motion." Appellant contends that "[a]lthough a trial court must make credibility determinations so that it may make factual findings, whether a witness' testimony is challenged or effectively rebutted is not itself a fact to be considered in the assessment of voluntariness." Contrary to appellant's assertion, the district court did not consider that the officers' testimony was unrebutted as a fact in itself weighing in favor of finding Lawson's consent to be voluntary. It merely made a credibility determination based in part on the fact that the officers' testimony was unrebutted, and decided to "accept [the officers' testimony] as true and accurate" on the issue of Lawson's consent to be searched. Mem.Ord. at p. 7. Indeed, in its oral ruling the district court was quite aware that the officers' "testimony could have hurt them ... as much as helped them on the issue of consent," indicating that the court was willing to rely on the officers' testimony regardless of whether it undermined or supported a finding of voluntariness of the consent. [Transcript of District Court's Oral Ruling at p. 7.] Taking the district court's judgment as a whole, therefore, we can detect no error on the question of whether Lawson voluntarily consented to be searched.
 
 
 46
 Accordingly, in the event that the stop itself was lawful, we would affirm the district court's judgment on the issue of Lawson's subsequent consent to the search. However, if the officers did not have the articulable suspicion necessary for the stop, his subsequent consent cannot cure the unlawfulness of the stop, and the evidence that was seized must be suppressed. See Florida v. Royer, 460 U.S. 491 (1983); United States v. Maragh, 894 F.2d 415, 419-20 (D.C.Cir.) ("[T]he [district] court apparently proceeded under the view that consent could cure an unlawful seizure. This is an erroneous statement of law." (citing Wong-Sun v. United States, 371 U.S. 471 (1963))), cert. denied, 498 U.S. 880 (1990).
 
 III. CONCLUSION
 
 47
 In its memorandum order denying the motion to suppress, the district court relied exclusively upon the anonymous tip and the fact that the neighborhood was known as a site for illegal drug transactions in validating the police officers' actions in stopping Pernell Lawson. We find these two factors alone insufficient to justify the stop. We remand the record to the district court for an additional hearing and for specific findings on whether Lawson had made any attempt to sell drugs to Officers Nassar and Croson on a prior occasion that would serve as a basis for justifying the stop. If the district court finds that the officers recognized Lawson as the person who they believed offered to sell them drugs on a previous occasion, the trial judge's conclusion that the officers were justified in stopping appellant can be sustained and the motion to suppress denied. In the event the trial judge does not find evidence of any such prior encounter, he shall review the hearing record as it currently stands in order to clarify his findings of fact on the issue of Lawson's association with the alleged drug dealer, Erky Berk. The trial judge shall certify to us his findings and conclusions. We will then supplement the record with the additional hearing and the trial judge's subsequent findings on the issue of Lawson's alleged prior offer to sell drugs to the officers, any further materials submitted by the parties to the district court, as well as any findings on the issue of Lawson's association with Erky Berk. The Clerk of this court will then set a schedule for supplementary briefing and the matter will be returned to this panel for disposition.
 
 
 
 [1]
 The legality of this police practice is not before us