# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-99-00793-CR

**The State of Texas, Appellant**

**v.**

**James Dean Fudge, Appellee**

**FROM THE COUNTY COURT AT LAW NO. 5 OF TRAVIS COUNTY**
**NO. 517,426, HONORABLE DAVID F. CRAIN, JUDGE PRESIDING**

## DISSENTING OPINION

Because I do not believe the law provides, as the majority holds, that a person unknown to a police officer, who offers an unsolicited, uncorroborated "tip" in a face-to-face encounter is, without more, inherently reliable, thus providing a sufficient basis for a valid traffic stop, I respectfully dissent.

On a sparse record, the experienced trial judge evaluated the meager facts before him and concluded that the officer had neither reasonable suspicion nor probable cause to stop appellee in his automobile. This case turns on what is *not* in the record along with the weight to be given the scant testimony in the record—an assessment the trial court was in the best position to evaluate. The

majority's holding, that a police officer may act to make a traffic stop based on a conclusory tip passed along to him from an unknown individual, is precisely the view rejected in Supreme Court decisions establishing the federal constitutional parameters in this area.

It is undisputed that the *sole* basis for the stop was the tip given to the officer by the unknown cab driver. Officer Pruett, the only witness at the hearing, testified as follows:

> [Defense Attorney]: When you pulled over [appellee] or when you stopped or detained him, the only reason you were detaining him is because of what the cabby had told you; isn't that correct?
>
> [Officer Pruett]: Correct.
>
> [Defense Attorney]: You hadn't seen any kind of road violations or violations of the driving laws; isn't that correct?
>
> [Officer Pruett]: That's correct.
>
> [Defense Attorney]: And you hadn't seen any equipment violations or anything like that?
>
> [Officer Pruett]: No.
>
> [Defense Attorney]: Okay. And did you know this cab driver?
>
> [Officer Pruett]: No.
>
> [Defense Attorney]: Okay. So you had no reason or no indicate [sic] to believe what he was telling you at that time was reliable; isn't that correct?
>
> [Officer Pruett]: I was just going on what he told me.

Because the State failed to carry its burden that the officer had either the "quantity" or "quality" of information required for a vehicle stop, I would affirm the trial court's suppression of the evidence obtained in violation of the Fourth Amendment to the United States Constitution and Article I,

2

section 9 of the Texas Constitution. U.S. Const. amend. IV; Tex. Const. art. I, § 9; *Alabama v. White*, 496 U.S. 325, 330 (1990); *Hulit v. State*, 982 S.W.2d 431 (Tex. Crim. App. 1998).

***Standard of Review***

In according the trial court its proper and necessary role, we give almost total deference to the trial court's findings of fact and conduct a *de novo* review of the court's application of law to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1999)). In this case, the trial court was not asked to make explicit findings of historical facts. We, therefore, review the factual basis for the trial court's ruling in a light most favorable to the ruling. *Carmouche*, 10 S.W.3d at 327; *State v. Ballard*, 987 S.W.2d 889 (Tex. Crim. App. 1999). We further assume the trial court made "implicit findings of fact supported in the record that buttress its conclusion." *Carmouche*, 10 S.W.3d at 328.

In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses *and the weight* to be given their testimony. *Ballard*, 987 S.W.2d at 891. In parsing the degree of deference to be given the trial court's determinations, the court of criminal appeals observed in *Guzman*, "The amount of deference a reviewing court affords a trial court's ruling on a 'mixed question of law and fact' (such as the issue of probable cause) is often determined by which judicial actor is in a better position to decide the issue." 955 S.W.2d at 87.

That the trial judge determined the officer was "credible" was not the only factual determination to be made by the trial judge in this case. Although the facts here are largely undisputed, it would appear from the majority opinion that the inferences to be drawn from those

3

facts are anything but clear. Certainly, the trial judge was entitled to evaluate the officer's testimony that the tipster said he "believed" the driver was drunk when determining the weight he would attribute to the testimony, and concluding that the facts established by the officer's testimony *did not* constitute reasonable suspicion or probable cause for the detention. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *see also State v. Ross*, 32 S.W.3d 853 (Tex. Crim. App. 2000).

When properly applying these standards to a review of the record, I conclude that the trial court did not abuse its discretion in deciding to suppress the evidence.

### *Automobile Stop*

Stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *see also Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *cf. Terry v. Ohio*, 392 U.S. 1, 16 (1968). We impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement officers, in order to "'safeguard the privacy and security of individuals against arbitrary invasions . . . .'" *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)).

The decision to stop an automobile is generally deemed to be reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren,* 517 U.S. at 813; *Prouse*, 440 U.S. at 659. With the presence of an objectively valid reason for stopping a car such as a traffic violation, the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officer involved. *Whren*, 517 U.S. at 813. A mere hunch that a

4

particular car might contain drugs—though far short of the reasonable suspicion required to stop a car temporarily to investigate—can nevertheless be the motivation for a traffic stop so long as the officer has *observed* a traffic violation. *Id*. at 810-13. While much criticized because of the limitless possibilities of traffic infractions that give police expansive discretion to stop motorists, this so-called "pretext" stop—when based on probable cause—is now well established in the law. *See, e.g., id.* at 818-19; *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992); *United States v. Castro*, 166 F.3d 728, 732 (5th Cir. 1999) (lacking reasonable suspicion, but with information defendant was engaging in drug trafficking, law enforcement agents followed vehicle driven by defendant 115 miles until officers observed traffic violation—driver not wearing seat belt). While giving significant latitude to law enforcement, even the *Whren* court recognized the importance, at the very least, of firsthand observation or surveillance by law enforcement officers. In *Whren*, presented with the fact that the officer had observed a traffic violation, the Supreme Court concluded that objective circumstances justified stopping the car. 517 U.S. at 817.

In rejecting the pretext claim raised in *Whren*, the Supreme Court expressed a strong preference for tying the legality of law enforcement measures to objective circumstances, rather than to officers' intentions. Thus, the Court reasoned that a traffic stop based on an observation of a traffic offense "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved" or whether "the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop for the reasons given." *Id.* at 813. The objective test thus allows the protections of the Fourth Amendment to not turn on police practices that "vary from

place to place and from time to time," a prospect the court found unacceptable. *Id.* at 815. The "reasonable officer" test gives rise to the difficult problems of application we have here. Because of the lack of maturation of reasonable suspicion in the instant cause, the majority forces us into an inquiry largely rejected by the Supreme Court in these circumstances.

The legality of investigative stops of automobiles without probable cause was first considered by the Supreme Court in *United States v. Brignoni-Ponce.* 422 U.S. at 873. In that case, Border Patrol agents conducting roving patrols in areas near the international border asserted statutory authority to stop at random any vehicle in order to determine whether it contained illegal aliens or was involved in smuggling operations. The practice was held to violate the Fourth Amendment, but the Court did not invalidate all warrantless automobile stops upon less than probable cause. Given "the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border," the Court analogized the roving-patrol stop to the on-the-street encounter addressed in *Terry v. Ohio*, and held:

> Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*Id*. at 884 (footnote omitted).

In *United States v. Martinez-Fuerte*, the Supreme Court considered the constitutionality of checkpoint operations at border stations. 428 U.S. at 556-58. The court sustained the checkpoint stops because of the "lesser intrusion upon the motorist's Fourth Amendment interests: [w]e view checkpoint stops in a different light because the subjective

6

intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *Id*. at 558; *but see City of Indianapolis v. Edmond*, 121 S. Ct. 447, 457 (2000). Balancing the public interest against the individual's Fourth Amendment interests, the Supreme Court in *Delaware v. Prouse* held that

> except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

440 U.S. at 662.

In the absence of probable cause, then, an automobile stop is subject to the constitutional imperative that it not be "unreasonable" under the circumstances. *Whren*, 517 U.S. at 810. "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Prouse*, 440 U.S. at 654. The facts on which this intrusion is based must be measured against "an objective standard," whether the test is one of probable cause or reasonable suspicion. *Id*.

Short of probable cause that a violation has occurred, then, traffic stops are analogous to *Terry* stops in that an officer's investigatory stop of a vehicle must be based on specific[1] *and*

---

[1]  "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Terry v. Ohio*, 392 U.S. 1, 21 n.18 (1968); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (analogizing a traffic stop to a "*Terry* stop").

articulable facts sufficient to support the officer's reasonable suspicion that the person detained is involved in *criminal activity. See Terry*, 392 U.S. at 21-22; *Harris v. State*, 913 S.W.2d 706, 708 (Tex. App.—Texarkana 1995, no pet.). These facts must amount to something more than an inchoate and unparticularized suspicion or hunch. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 27); *Dickey v. State,* 716 S.W.2d 499 (Tex. Crim. App. 1986) (detention based "on a mere hunch" is illegal); *Williams v. State*, 621 S.W.2d 609, 612 (Tex. Crim. App. 1981). Because the facts must be specific and articulable it is insufficient for an officer to provide conclusory explanations. *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *Garcia v. State*, 3 S.W.3d 227, 237 (Tex. Crim. App. 1999).

The reasonableness of an investigative detention turns on the "totality of the circumstances" in each case. *Gates*, 462 U.S. at 230-31; *Shaffer v. State*, 562 S.W.2d 853, 855 (Tex. Crim. App. 1978); *State v. Sailo*, 910 S.W.2d 184, 188 (Tex. App.—Fort Worth 1995, pet. ref'd); *Davis v. State*, 794 S.W.2d 123, 125 (Tex. App.—Austin 1990, pet. ref'd). The Supreme Court has provided guidance to the meaning of this elusive concept "reasonable suspicion." In *United States v. Cortez*, the Court recognized that, because of the myriad factual situations that arise in a vehicle-stop context, any definition is difficult. 449 U.S. 411, 417-18 (1981). The essence of any analysis requires taking into account the "totality of circumstances," or "the whole picture":

> Based upon the whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds

of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

* * *

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.* (citations omitted). Based upon numerous objective facts obtained from the agents' previous experiences and knowledge, surveillances, and other investigatory techniques, the *Cortez* court concluded that the agents lawfully stopped the subject vehicle for questioning of its occupant. In reviewing a decision, we do not consider the various factors in isolation, but rather in their interrelated context, where each may reinforce the other, so that the "laminated total" may be greater than the sum of its parts. *United States v. Fooladi*, 703 F.2d 180, 184 (5th Cir. 1983).

Reasonable suspicion then, like probable cause, is dependent upon both the content of the information possessed by the police and its degree of reliability. *See Alabama v. White*, 496 U.S. 325, 330 (1990). "Both factors—quantity and quality—are considered in the totality of the circumstances—the whole picture . . . must be taken into account when evaluating whether there is reasonable suspicion." *Id.* (citing *Cortez*, 449 U.S. at 417); *see also Carmouche*, 10 S.W.3d at 328-29; *Reynolds v. State*, 962 S.W.2d 307, 311 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd).

Likewise, the Texas Court of Criminal Appeals has recognized that people are not shorn of their Fourth Amendment protection when they step from their homes into their automobiles. *Carmouche*, 10 S.W.3d at 328. Most recently, in *Schenekl v. State*, the court addressed the constitutionality of a state law permitting a law enforcement officer to stop and board a boat without

probable cause or reasonable suspicion. 30 S.W.3d 412, 413 (Tex. Crim. App. 2000). Citing *Prouse*, the court observed that automobile travel is a "'basic, pervasive, often necessary means of transportation in our society.'" *Id.* at 416 (quoting *Prouse*, 440 U.S. at 662). "As such, there is a heightened expectation of privacy while in a car as compared to a boat." *Id.*

We note that this case differs from the *Terry* line of cases in important respects. Officer Pruett himself observed no "unusual conduct" leading him "reasonably to conclude . . . that criminal activity may be afoot." The officer's sole basis for believing that the appellee may have been committing a crime was the alleged tip from the not-proved-to-be-reliable, unnamed tipster.[2] Moreover, in *Terry*, what the officer saw was "unusual conduct" giving the officer a reason to believe that an armed robbery was about to be committed; swift intervention on his part was *required* to prevent a violent crime. Here, there is no suggestion in the record that the appellee was departing the parking lot or otherwise engaging in any behavior involving imminent danger that required Officer Pruett to forego any type of surveillance and instead act immediately to prevent a crime. Surely, if there had been such behavior, the prosecutor would have elicited the testimony. Instead, the record is silent regarding any need for Officer Pruett to act immediately. From this record, the absence of any type of imminent danger is just the sort of implied finding that we accord to the sound discretion of the trial court. Reliance upon the conclusory tip of the informant here is inherently inconsistent with the Supreme Court's totality-of-the-circumstances analysis. Based on the record, I believe

---

[2] In actuality, the tipster's personal observation concerned erratic driving behavior. It was the tipster's hypothesis that this behavior could be the result of driving while intoxicated as opposed to non-criminal driving behavior such as inattentive driving conduct.

Officer Pruett acted on the tip with nothing more than "an inchoate and unparticularized suspicion or hunch" that called for some type of corroboration.

Because we require an officer's observations to be specific and articulable and not conclusory, it would be an anomalous result if we allowed a stop based on a conclusory hunch or inchoate suspicion or a conclusory statement from an unknown tipster. If the majority is correct about the state of the law—a tipster's conclusory statement is sufficient for a traffic stop—we are presented with the anomaly that a law enforcement officer would be able to act on a tip from another that, if he himself had observed the conduct firsthand and testified in such a conclusory manner, the stop would not be upheld. *See, e.g., State v. Arriaga*, 5 S.W.3d 804, 807 (Tex. App.—San Antonio 1999, pet. ref'd).

Texas courts have never allowed a vehicle stop based on an uncorroborated tip and we should not do so now. *See, e.g., State v. Garcia*, 25 S.W.3d 908 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (criminal activity detailed with some particularity was corroborated); *Glenn v. State*, 967 S.W.2d 467 (Tex. App.—Amarillo 1998), *pet. dism'd*, 988 S.W.2d 769 (Tex. Crim. App. 1999) (anonymous tip corroborated by police officer's prior knowledge of suspect's criminal activities and surveillance of predictive behavior); *State v. Adkins*, 829 S.W.2d 900, 902 (Tex. App.—Fort Worth 1992, pet. ref'd) (police officer observed traffic offense after receiving anonymous tip defendant driving while intoxicated).

Because here the arresting officer was the only witness at the hearing and he testified that the basis of the stop rested entirely on the information provided by the cab driver, we turn to the

11

weight an officer may place on a tip given to him in person by an unidentified, and previously unknown, informant.

### *Informants and Tipsters*

A police officer "may rely upon information received through an informant, rather than on his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge*." *Gates*, 462 U.S. at 242 (quoting *Jones v. United States*, 362 U.S. 257, 269 (1960)) (emphasis added). Corroboration by the officer means, in light of the totality of the circumstances, the officer confirms enough facts so that he may reasonably conclude that the information provided is reliable and a temporary detention is justified. *See White*, 496 U.S. at 330-31. Corroboration by the police officer necessarily goes to the quality and reliability of the information. Where the information has a fairly low degree of reliability, more information is required to establish the requisite level of suspicion necessary to justify an investigative detention. *Id.* at 330. Where the reliability of the information is increased, less corroboration is necessary. *Id.*

In cases where the Supreme Court has reviewed investigatory stops, part of its analysis in evaluating the totality of the circumstances has included reviewing the reliability of the informant or tipster. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000); *White*, 496 U.S. at 331-32; *Gates*, 462 U.S. at 225; *Adams v. Williams*, 407 U.S. 143, 144-47 (1972). In determining the reliability of people providing information to police officers, the Supreme Court has considered (1) known informants, individuals with whom the police have previously worked and whose reliability has been established and (2) unknown informants or tipsters who call into the police and leave tips anonymously.

12

In *Williams*, the Supreme Court determined that an unverified tip from a known informant was not reliable enough to establish probable cause to arrest, but upheld an investigative stop based on an informant's tip bearing sufficient "indicia of reliability." *Id.* at 146-47; *see also Carmouche*, 10 S.W.3d at 328. In *Williams*, such "indicia" was shown by evidence that (1) the informant was personally known to the officer; (2) the informant had provided the officer with information in the past; *and* (3) the informant was subject to arrest for making a false complaint had the officer's investigation proved the tip false. 407 U.S. at 147.

In *Gates*, the Supreme Court suggested that, standing alone, an anonymous tip would not be sufficient for probable cause. Adopting the totality-of-the-circumstances test, the Court took into account the facts known to the officers from personal observation, and gave an anonymous tip weight in light of its indicia of reliability as established through independent police work. *Gates*, 462 U.S. at 242-46. Recognizing that informant's tips, like all evidence coming to a police officer on the scene, may vary greatly in their value and reliability, the *Gates* court determined that in light of the anonymous informant's tip as corroborated by independent police work, the arrest was justified. *Id.* These same factors are also relevant in the reasonable suspicion context except that a lesser showing of suspicion is required. *White*, 496 U.S. at 328-29.[3]

---

[3] In *United States v. Villamonte-Marquez,* the Supreme Court upheld a stop of a vessel in the open seas based on an anonymous tip. 462 U.S. 579 (1983). The Court stated: "It seems clear that if the customs officers in this case had stopped an automobile on a public highway near the border, rather than a vessel in a ship channel, the stop would have run afoul of the Fourth Amendment because of the absence of articulable suspicion." *Id*. at 588. Acknowledging the limits on police powers to stop, without searching vehicles, Justice Brennan in his dissent noted that the Court had "continued to insist, as we have always done, that there must be some meaningful check on the arbitrary discretion of the police." *Id*. at 602 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 558-59 (1976) and *United States v. Brignoni-Ponce*, 442 U.S. 873, 882-83 (1975)).

13

In *White*, an anonymous caller left a telephone tip with the police that a particularly described woman was carrying cocaine and predicted she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named hotel. The tip was corroborated by independent police work that included surveillances. The *White* court held that, while the police did not verify every aspect of the anonymous tip, they did verify facts that involved future actions or predictive information that was the type not ordinarily or easily predicted. *Id.* at 332. Recognizing that the case was a close one, the Court concluded that "under the totality of the circumstances, the anonymous tip *as corroborated*, exhibited sufficient indicia of reliability to justify the investigatory stop." *Id.* (emphasis added).

Most recently in *Florida v. J.L.*, the police dispatcher received an anonymous telephone tip that a particularly described youth at a particular location was carrying a concealed gun. 529 U.S. at 268. Like the instant case, the officers' suspicions that J.L. was carrying a weapon arose not from any observations of their own but instead solely from information provided by an unknown caller. The Supreme Court thus addressed the issue whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. The Court held that the tip was not properly corroborated and the investigative stop was not justified. *Id.* at 272. In *J.L.*, the officer corroborated only identifying information relating to the youth's location and appearance. The tipster did not provide any predictive information and the police officer stopped J.L. based only on the anonymous tip. While the information given by the tipster helped the police officer correctly identify the person the tipster meant to accuse, the tip did not show that the tipster had knowledge of the concealed activity. Additionally, the police officer did not corroborate

14

any criminal activity. The officer did not testify that he observed actions indicating illegality or testify about matters within his knowledge that would reasonably corroborate criminal activity. *Id.* The Supreme Court stated:

> That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L. If *White* was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

*Id.* At 271. In rejecting the government's argument that a stop should be permitted when a description by an anonymous tip is verified and "there are no factors that cast doubt on the reliability of the tip," the Court concluded that these contentions "misapprehend the reliability needed for a tip to justify a *Terry* stop." *Id.* "The mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a *Terry* stop without meeting the reliability requirement." *Id*. at 273 n.1. The Court further declined to recognize an exigency exception for firearms that would have relieved the State from having to meet the *Gates* reliability requirement. *Id.* at 273. If bare-boned tips about guns could provide the basis for *Terry* stops, the Court reasoned that it would be reasonable then to extend the exceptions to narcotics cases. This the Court refused to do: "As we clarified when we made indicia of reliability critical in [*Williams*] and *White*, the Fourth Amendment

15

is not so easily satisfied." *Id.* at 1379.[4] In *Stewart v. State*, this Court rejected a "DWI exception" to the corroboration requirement. 22 S.W.3d 646 (Tex. App.—Austin 2000, pet. ref'd).

In analyzing the use of informants in connection with vehicle stops, the Texas Court of Criminal Appeals has tracked the analysis of the Supreme Court. In *Carmouche*, the court examined a vehicle stop based on information from a reliable informant who had provided accurate information on prior occasions. 10 S.W.3d at 323. The *Carmouche* court concluded that the informant's history of providing reliable information established a sufficient "indicia of reliability" to credit her information. *Id.* at 328 (citing *Williams,* 407 U.S. at 146-47). Even so, the court did not uphold the stop based on the informant's tip alone. The court upheld the stop based upon three factors: (1) the informant's tip; (2) the informant's previous history of providing reliable information to authorities; and (3) surveillances by the officers that served to corroborate her information. *Id.* While the informant's information alone was insufficient, "all of the surrounding circumstances, taken together, justified the stop." *Id*. at 329. Additionally, the court noted that the stop was justified because one of the officers observed a traffic violation. *Id*. at 329 n.6 (citing *Whren*, 517 U.S. at 806).

---

[4] The Supreme Court recognized that there may be circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability, such as a bomb threat. And, of course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct, *see Cortez*, or in locations where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, schools, or checkpoints. *J.L.*, 529 U.S. 266, 274 (2000); *but see City of Indianapolis v. Edmond*, 121 S. Ct. 447, 454 (2000) (reaffirming seizure other than at checkpoint "must be accompanied by some measure of individualized suspicion").

16

***Is a Face-to-Face Encounter with an Unknown Person an Encounter With a Known Informant or an Anonymous Tipster?***

The issue before us then is whether, based on the fact that the face-to-face tip in this case came from a cab driver unknown to the police officer, the cab driver should be treated as (1) a known, reliable informant such that corroboration is unnecessary; (2) an anonymous tipster and, as in *J.L.*, some corroborating evidence or predictive information is required; or (3) an informant somewhere along the spectrum of known-unknown informants and *suitable* corroboration is required. *See J.L.*, 529 U.S. at 270. Here, as in *J.L.*, the record establishes that nothing was known about the informant. In *J.L.*, the Supreme Court squarely addressed facts like those before us:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id.* at 272. The Supreme Court in *J.L.* also stressed the importance of *predictive* information of criminality that could be corroborated by observation. *Id.* at 271-72.

Courts have uniformly held that an anonymous tip may justify the *initiation* of an investigation, but it *alone* will rarely establish the level of suspicion sufficient to justify a detention. *E.g., White*, 496 U.S. at 329; *Davis v. State*, 989 S.W.2d 859, 863 (Tex. App.—Austin 1999, pet. ref'd); *Adkins*, 829 S.W.2d at 900. A police officer must have additional facts before the officer may reasonably conclude that the anonymous tip is considered reliable and an investigatory detention is justified. *Davis*, 989 S.W.2d at 863. An officer's prior knowledge and experience, and his

17

corroboration of the details of the tip, may be considered in giving the anonymous tip the attention or weight it deserves. *Id.* at 864. But the corroboration of details that are easily obtainable at the time the information is provided, and which do not indicate criminal activity, will not lend support to the tip. *Stewart*, 22 S.W.3d at 649.

In *Davis*, a police officer was informed that a caller had reported that a particularly described vehicle was being driven northbound on Interstate 35 at a specified location; that it was occupied by three males; that the vehicle was being driven recklessly; and that the occupants were possibly smoking marihuana. 989 S.W.2d at 861. The officer positioned himself to intercept the suspect vehicle and stopped it. *Id.* The officer witnessed no offense and acknowledged that he acted solely on the basis of the tip. *Id.* The caller did not identify himself, stop at the scene, or otherwise come forward. *Id.* This Court held that "the anonymous tip, uncorroborated as to its significant aspects by independent police work, did not exhibit sufficient indicia of reliability to justify the investigative stop." *Id.* at 865.

In *Adkins*, the court of appeals upheld a vehicle stop based on a tip from an unidentified citizen. In that case, the officer initiated the stop because the citizen had informed the officer that the driver of the car appeared to be "extremely intoxicated" and the car was approaching an intersection controlled by a traffic light. Consistent with the tip, the officer observed that the vehicle had a flat tire on the right rear wheel that was badly damaged. The issue on appeal was whether information from a concerned citizen is legally sufficient to establish reasonable suspicion. The *Adkins* court recognized that unless an informant's tip carries sufficient "indicia of reliability," it requires further investigation before a forcible stop of a vehicle would be authorized. 829 S.W.2d

18

at 901-02. Recognizing that an informant's veracity, reliability, and basis of knowledge "are highly relevant," the court agreed with the Supreme Court in *Gates* that an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles an informant's tip to greater weight than might otherwise be the case." *Id.* at 901 (citing *Gates*, 462 U.S. at 234). On critical facts, *Adkins* may be distinguished from the case at hand. In *Adkins*, the record makes clear that the basis for the informant's information was his firsthand observation that Adkins was driving dangerously. In addition, *the officer observed behavior*—Adkins driving on the rim of his tire—that sufficiently corroborated the tip. The majority opinion noted that Adkins's conduct of driving on his tire rim was a violation of state law. The record also established the existence of exigent circumstances. The record established that Adkins was driving on city streets and, further, the officer was "[c]oncerned that the possible DWI suspect might get away." *Id.* at 901.

Indeed, the Supreme Court has never upheld an investigatory stop of an individual—much less a vehicle stop—on the quantum of evidence relied on in the case before us. In *Adams v. Williams*, a police officer acted upon an informant's tip. The fact that the informant personally came forward to give information that was immediately verifiable at the scene led that Court to conclude that "[t]his is a stronger case than obtains in the case of an anonymous telephone tip." 407 U.S. at 146. The informant's unverified tip alone, however, was insufficient to justify the detention. The *Williams* court found the information carried enough "indicia of reliability" to justify the stop because the informant was known to the officer personally and had provided him with reliable information in the past. *Id.*

In this cause, Officer Pruett confirmed only one fact that the cab driver told him, that appellee was nearby in a white pickup. The record is silent regarding any other facts that could have possibly been corroborated by Officer Pruett. The fact that the white truck was nearby, apparent to any observer, gave Officer Pruett little, if any, reason to credit the cab driver's further "belief" that appellee was intoxicated. Based on the sparse record, I would hold that Officer Pruett had only the quantum of information to *initiate* an investigation. The information he had at the time he stopped appellee did not rise to the constitutionally necessary level of reasonable suspicion.

Officer Pruett's options at the time he was approached by the cab driver were many: he could have inquired further of the informant to establish his identity or the reliability of the informant's observations, or he could have simply observed the appellee, looking for signs of erratic driving or a traffic violation. Again, while the record is undeveloped as to what occurred, it appears that Officer Pruett observed the appellee drive his truck in a normal manner around the convenience store, then forced appellee to stop and get out of the truck. The trial court could have found from this record that the defendant was about to park his truck and enter the convenience store. Further, the implied findings which we accord to the sound discretion of the trial court certainly do not indicate that the appellee was about to exit the parking lot and re-enter traffic.

Whether the informant is more akin to the anonymous tipster or a known informant, however, the record is clear that no reliability has been established. We need not find that the cab driver is akin to an anonymous caller to conclude that his information should be accorded different treatment than that of a confidential informant who has provided accurate and reliable information on prior occasions. So far as the record reveals, nothing is known about the informant except that

he was driving a cab. The record is silent as to whether the informant remained at the scene or departed immediately. Here, there was no testimony about whether the cab driver was identified or identifiable; there was no testimony about whether the officer asked the cab driver about the details of what he had observed or acquired any information to establish the tipster's reliability. In reviewing the totality of the circumstances, I would hold that, on the meager record in this case, the cab driver is akin to an anonymous tipster as in *J.L.*, and the corroboration aspect of the *Gates* reliability analysis must be met.

Suffice it to say that information this far short of the line must be corroborated in some manner—either by additional questioning of the tipster or by firsthand observation of the officer. Because the record is so sparse, and there is no evidence at all corroborating the tip, the officer's stop was premature and, thus, not based on reasonable suspicion.

### *Sailo and Sierra-Hernandez*

In reversing the trial court's suppression of the evidence, the majority abandons the corroboration requirement set out in the Supreme Court opinions of *J.L.*, *Gates*, and *White*. I believe the majority's reliance on *Sailo* and *Sierra-Hernandez* is simply misplaced. Despite face-to-face tips in both *Sailo* and *Sierra-Hernandez*, neither court abandoned the corroboration aspect of the *Gates* reliability analysis. *Sailo*, 910 S.W.2d at 189; *United States v. Sierra-Hernandez*, 581 F.2d 760, 762 (9th Cir. 1978). Moreover, to the extent that either case is read to allow a stop on an uncorroborated tip, both cases precede the Supreme Court's decision in *J.L.*

In *Sailo* and *Sierra-Hernandez*, the courts determined that there were articulable facts within the officers' personal knowledge independent of the information the officers received face-to-

21

face from the unidentified informants that corroborated the informants' information. 910 S.W.2d at 189; 581 F.2d at 763. In *Sailo*, the court of appeals determined that the tip was reasonably corroborated because, along with the fact that the suspect was described with particularity, the officer knew that the area was one of frequent DWI encounters. 910 S.W.2d at 189. Likewise in *Sierra-Hernandez*, the informant pointed to a black pickup truck and told the border agent, "The black pickup truck just loaded with weed at the canebreak." 581 F.2d at 762. The nearby canebreak was known as a site of previous incidents of drug smuggling and illegal entry of aliens. *Id.*

In *Sierra-Hernandez*, the court held that information from a citizen who confronts a police officer in person to advise the officer that an individual present on the scene is committing a specific crime should be given serious attention and great weight by the officer. 581 F.2d at 763. The court noted that a person not connected with the police or who is not a paid informant is inherently trustworthy when he advises the police a crime is being committed. *Id.* "Nevertheless, whether the information is sufficient to justify a stop must be evaluated with reference to the facts of each case, for there is no per se rule." *Id.* Each case is reviewed based on the totality of the circumstances or the "whole picture" when evaluating the reasonableness of the officer's conduct. The *Sailo* court, following the reasoning in *Sierra-Hernandez*, held that there was nothing in the record that should have caused the officer to doubt the reliability or good faith of the informant tendering the information.[5] Important to this case is that in *Sierra-Hernandez* and *Sailo*, the courts found the tips were corroborated.

---

[5] *Sailo* and *Sierra-Hernandez* preceded *J.L.* which rejected this factor as "misapprehend[ing] the reliability needed for a tip to justify a *Terry* stop." *See J.L.*, 529 U.S. at 272.

22

In this case, the State did not elicit any testimony from Officer Pruett that (1) the convenience store was a particularly frequent area for DWIs or the site of previous criminal activity; (2) the store was closed and driving into the parking area and around the store was suspicious activity; (3) it was late at night at a time when bars commonly close and drivers may be driving while intoxicated; or (4) he himself observed appellee driving erratically. Nor did the State elicit any testimony about the identity, availability, or other facts indicating that the cab driver was providing reliable information. Nor was there testimony that the cab driver was identifiable because some type of identification was obtained for possible later use. The State simply did not elicit any testimony concerning the identity of the cab driver or even whether he remained on the scene.

*Sailo* and *Sierra-Hernandez* are also readily distinguishable from this case because in those cases the courts recognized the existence of exigent circumstances. From the facts presented in *Sierra-Hernandez*, the court concluded that the informant "would have been available for further questioning if the agent had judged the procedure appropriate." *Id.* The court further found that there were articulated reasons to support the agent's failure to converse further with the informant, to ask for his name, or to note the license of his car: The suspect was in a vehicle moving away from the agent when the tip came and the court found that it was reasonable under the circumstances for the agent to radio for assistance and to set off in pursuit, rather than to question the informant. *Id.*[6]

---

[6] In *Sailo*, the officer asked the citizen-informant to stop and pull over, presumably so the officer could obtain information from him. Although the informant initially pulled over to the side of the roadway, he evidently drove off after the stop but before either officer could get any identifying information. *State v. Sailo*, 910 S.W.2d 184, 186-87 (Tex. App.—Fort Worth 1992, pet. ref'd). The reasonableness of suspicion is measured by what the officer knew at the time of the stop. *J.L.*, 529 U.S. at 271.

In both *Sailo* and *Sierra-Hernandez*, the police officers described the informant with particularity and further, based on the "totality of the circumstances," justified the stops because of exigent circumstances. I find it significant as well that in both cases the appellate courts upheld the trial courts' decisions.

### Did Officer Pruett Corroborate the Tip?

Even the State does not argue that they do not have to corroborate the tip; rather, they argue that the tip *was* corroborated. The State contends that Officer Pruett sufficiently corroborated the unidentified cab driver's information when he observed appellee pull into the convenience store and drive around the back of the store. The State argues that such activity was out of the ordinary and increased the likelihood that appellee was intoxicated. Officer Pruett's testimony contradicts this assertion.

Officer Pruett did not testify that he thought appellee's driving around the convenience store was strange, suspicious or out of the ordinary. Nor did he testify that appellee drove fast, slow or abnormally around the convenience store. Officer Pruett testified: "I looked and I saw [the truck] going around the back of the store, and then the vehicle came around [to] the front of the store." On cross examination, Officer Pruett testified that, "I turned around and saw the pickup pull in toward the back of the store in the parking lot, went around the store." The record is silent as to whether there was anything unusual or suspicious about appellee driving around the back of the store.

The record is silent as well on other critical details. As the majority acknowledges, the record does not contain any evidence about the location of the stop except that it took place in the parking lot of a convenience store at the corner of Ben White and South Congress. The State did

24

not establish the time of day the incident occurred (or even whether it was day or night), whether the store was open or closed, whether the appellee was alone in the vehicle, whether there was traffic at the store or the parking lot was full and appellee simply drove around the back of the store looking for a place to park. Reviewing the factual basis for the trial court's ruling, there was absolutely no evidence establishing that Officer Pruett considered appellee's driving around the back of the convenience store unusual or an out-of-the-ordinary activity that might have corroborated the tip. Additionally, Officer Pruett testified that he stopped appellee in his routine manner by shining his flashlight at appellee and knocking on the driver's window.[7]

The State finally argues that Officer Pruett had to act quickly to detain appellee because appellee was leaving the convenience store and was driving back into the stream of traffic on South Congress Avenue. There is no evidence in the record supporting this assertion. Significantly, unlike *Sailo* and *Sierra-Hernandez*, Pruett did not testify to any exigent circumstances and his testimony is silent about whether appellee was attempting to park or to continue driving back onto South Congress. From these facts, the trial court could easily conclude that appellee was in the process of parking to enter the store. Even if *J.L.* had permitted an exigency exception,[8] the record here is inadequate to warrant such a finding. Certainly, the immediacy of the investigation is a relevant consideration under the totality-of-the-circumstances test. But the State had the burden of

---

[7] The State in its brief attempts to characterize the way Officer Pruett stopped appellee as corroborating the cab driver's tip and providing Officer Pruett with the necessary reasonable suspicion for the stop. At the hearing, Officer Pruett testified that he frequently stopped cars in that same manner.

[8] *See* 529 U.S. at 272-73.

proving that an exigency existed. *See United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997). Here, the State did not elicit testimony that exigent circumstances existed.

Unlike the cases cited by the majority, there simply were no specific facts *in the record* from which the officer could, in light of his experience and personal knowledge, together with inferences from those facts, give him cause to effectuate a traffic stop. The inferences drawn by the majority are without a factual basis. The majority, for example, infers that appellee was unknown to the tipster and that therefore the driver was merely a good citizen as in *Sierra-Hernandez*; there is nothing in the record from which one may draw such an inference. There is nothing in the record to indicate that the informant is a mere citizen without motive or animus whose tip should be given weight or serious attention. The majority also infers that the tipster was somehow "accountable for his intervention." Again, unlike *Sierra-Hernandez*, there is nothing in the record to support this assumption.[9]

The majority also assumes the informant's statement to the officer is based on personal knowledge. There is no testimony that the informant spoke with personal knowledge of the matters the officer claimed the informant observed. The assumptions made by the majority are pure

---

[9]  The majority also makes reference in a footnote to an affidavit for warrant of arrest contained in the clerk's record. That document was not introduced into evidence and was not before the trial court. The majority appears to assume that the individual named is the tipster, but there is no evidence in the record from which one could make that inference. It is cause for no small wonder that, in the suppression hearing, the prosecutor never asked for and the officer never mentioned the identity of the tipster. In any event, while the document refers to information given concerning the offense of "weaving in and out of the lane, crossing double yellow line," it makes no reference to a DWI allegation and differs in other respects from the officer's testimony about the substance of the tip.

26

speculation and ignore the apparently contrary inferences that were made by the trial court in *granting* the motion to suppress.

To lawfully stop appellee, it was *not* necessary that Officer Pruett observe appellee perform illegal or criminal activity. But, under the *Gates* analysis, the State *was* required to establish that Officer Pruett had specific *and* articulable facts that in some manner corroborated the cab driver's reliability or tip of criminal activity beyond just identification of the suspect. The Supreme Court recognized in *Williams* that informants' tips may vary greatly in their value and reliability:

> Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

407 U.S. at 147. Unlike *Terry*, where swift intervention on the part of the officer was required to prevent a serious crime of violence, here, there is no evidence that appellee was preparing to re-enter a city street and endanger another, and the record suggests that the officer had ample means for placing appellee under surveillance. While most would agree that it would have been poor police work for Officer Pruett to simply walk away from the scene and do nothing, it is equally questionable that he blindly accept the tip and act on it without some further indication of its reliability; rather, the tip called for a calibrated response.

The tip here suffered from a threefold defect, with each fold compounding the others. The informant was unnamed, he was not shown to have been reliable as to the offense observed, and he gave no information that demonstrated personal observation of an offense. The unidentified cab

27

driver did not indicate to Officer Pruett that he had any personal knowledge that appellee was intoxicated, that he had observed appellee drinking at any time, or that he had any contact with appellee to know if he in fact was intoxicated. For all that appears in the record, the tipster merely concluded that drinking might be involved because Officer Pruett testified that the informant told him that he observed erratic driving. The record contains no independent facts corroborating the reliability of the tip or suggesting that either the informant or the officer observed a criminal offense. Consequently, when Officer Pruett stopped appellee he was acting on an inchoate and unparticularized suspicion or hunch rather than specific and articulable facts that appellee was intoxicated. This sort of tip differs markedly from the accurate prediction of behavior recognized by the Supreme Court in *J.L.* The tip, uncorroborated as to its significant respects by independent police work, did not exhibit sufficient indicia of reliability to justify the investigative stop. Striking the balance here on this meager record, I would hold as did the trial court that the State failed to establish that Officer Pruett had the reasonable suspicion required to stop appellee.

If we are to rely upon the dispensations of the law, we must also draw on its constraints. In *Terry v. Ohio*, the Supreme Court admonished those who might call upon its teachings in close cases such as the one before us:

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusions upon

28

constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

392 U.S. at 21-22 (citations omitted).

Neither the ends of law enforcement nor the Fourth Amendment are served by reliance on the uncorroborated tip. The trial court expressly found that the officer was credible, but that in the absence of something more—such as additional information about or from the informant or observations by the police officer—the information on which the stop was based did not rise to the level required by *Terry* and *Gates*. In the absence of evidence demonstrating imminent danger or harm—or even a need for swift action—*Terry* should be extended only to those instances where observation by the officer himself or corroborated information shows "that criminal activity may be afoot." *Id.* at 30.

Exercising the scrutiny of the "detached" and "neutral" judge called upon to evaluate the reasonableness of this stop, I believe the trial court properly applied the law to the facts of this case and properly granted the motion to suppress. This is a close case; it requires a subtle evaluation of the weight to be accorded the brief testimony of a single witness and the trial court was in the best position to make that evaluation. The trial court did not abuse its discretion and we should affirm its exercise of that discretion.

I would affirm the trial court's order suppressing the evidence.

Jan P. Patterson, Justice

Before Justices Yeakel, Patterson and Jones[*]

Filed:   February 28, 2001

Publish

---

[*]   Before J. Woodfin Jones, Justice (former), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 75.003(a)(1) (West 1998).